**PEABODY ESSEX MUSEUM, INC., Plaintiff,**

v.

**UNITED STATES FIRE INSURANCE COMPANY, Defendant/Third–Party Plaintiff,**

v.

**Century Indemnity Company, Third–Party Defendant.**

**Civil Action No. 06cv11209–NG.**

United States District Court, D. Massachusetts.

March 31, 2009.

---

Jeremy A.M. Evans, Martin C. Pentz, Foley Hoag LLP, Boston, MA, for Plaintiff.

Michael F. Aylward, Morrison Mahoney LLP, Boston, MA, for Defendant/Third–Party Plaintiff.

Brian G. Fox, Mt. Laurel, NJ, David B. Chaffin, White and Williams LLP, Boston, MA, for Third–Party Defendant.

## MEMORANDUM AND ORDER RE: MOTIONS FOR SUMMARY JUDGMENT

GERTNER, District Judge.

### I. INTRODUCTION

This dispute between an insured, Peabody Essex Museum, Inc. ("the Museum"), and its insurer, United States Fire Insurance Co. ("U.S. Fire"), arose out of the 2003 discovery of oil damage to the land neighboring the Museum's property. The aggrieved landowner and the state environmental protection agency traced the damage to the Museum, which identified its underground tanks as the likely source. U.S. Fire refused to defend the Museum or cover the expense of cleanup. The Museum then settled its neighbor's claim for $300,000 and brought this suit against U.S. Fire for (1) breach of contractual duties to defend and indemnify, (2) declaratory judgment, (3) violation of state consumer protection law, and (4) negligence. U.S. Fire, in turn, sued the Museum's prior insurer, ACE Property & Casualty Insurance Company ("ACE"), for contribution.[1] All parties have moved for summary judgment.

In a typical suit for indemnity under an insurance contract, the insured bears the burden of proof as to coverage. Where the insurer is found to have breached its duty to defend—as U.S. Fire was in this case, see Electronic Order 12/19/2007—that burden shifts to the defendant. See Polaroid Corp. v. Travelers Indem. Co., 414 Mass. 747, 610 N.E.2d 912 (1993). U.S. Fire bears the burden of proving that the oil damage was not covered, either (1) because of when the damage to the neighboring property occurred, namely after pollution damage was wholly excluded from the U.S. Fire policy in December of 1985, or (2) because of how the discharge occurred, namely not "sudden and accidental," since a leak that commenced gradually is outside the policy coverage. Because of its dual burden, in the Peabody Essex—U.S. Fire case and in the U.S. Fire—ACE case, if U.S. Fire fails to prove that Peabody Essex's damages were "not sudden," it would be obliged to pay the plaintiff without being indemnified by ACE.

As explained below, there is contradictory evidence as to the first issue—whether the damage to the neighboring property occurred before or after December of 1985. But there is simply no evidence on the second issue—whether the breakage that caused the oil to escape from its tank occurred suddenly or gradually. No expert has shed any light on this question, and with good reason: Whatever caused the oil spill likely happened underground and possibly a generation back. The tanks and associated piping were unearthed and replaced long ago. No photographs reflect

---

1. ACE was originally misdesignated as "Century Indemnity Co." The proper third-party defendant is ACE Property & Casualty Insurance Company, formerly known as CIGNA Property & Casualty Company, formerly known as Aetna Insurance Company (referred to herein as "ACE" regardless of the name of the party at the time).

their condition at the time. And today, a new wing of the Museum sits atop the site of the former tanks.

In the usual case, the absence of evidence would redound to the detriment of the plaintiff who bore the burden of proof. With the burden of proving non-coverage on U.S. Fire as defendant in the Peabody Essex—U.S. Fire action, and as third party plaintiff in the U.S. Fire–ACE action, the result is the opposite.

Accordingly, I **GRANT** partial summary judgment for the Museum on the suddenness issue, **DENY** summary judgment on all other aspects of the claims between U.S. Fire and the Museum, and **GRANT** summary judgment for ACE as against U.S. Fire. I further **RESERVE** judgment on two outstanding legal issues: whether a demand letter from the Museum's neighbor triggered U.S. Fire's duty to defend, and whether U.S. Fire's indemnity obligations should be prorated to two years (the duration of its coverage).

## II. *FACTS*

Plaintiff, the Museum, is a nonprofit corporation organized under Massachusetts law and located in Salem, Massachusetts. Defendant and third-party plaintiff, U.S. Fire, is a Delaware corporation with its principal place of business in New Jersey. ACE, the third-party defendant, is a Delaware corporation and successor to Aetna Insurance Co.

In May 2003, Heritage Plaza Enterprises, LLC ("Heritage"), discovered heavy fuel oil in the soil at Heritage Plaza ("Heritage Site"), located next to the Museum's property, during the redevelopment of a former police station into condominiums. Pl. Mot. Summ. J., Ex. A (document # 20–2). Heritage then retained an environmental consulting firm, conducted soil and ground water investigations, and submitted a Downgradient Property Status Opin-

ion ("DPS Opinion") to the Massachusetts Department of Environmental Protection ("DEP"). *Id.* Following the investigation by the environmental consultant, Heritage concluded that the oil had migrated from an "upgradient" source, but did not initially identify the Museum as that source. *Id.* On October 17, 2003, Heritage concluded that the Museum was the source of the oil release, notified the Museum, and demanded contribution in the amount of $400,000 for clean-up costs pursuant to Mass. Gen. Laws ch. 21E, § 4A. *Id.* In response, the Museum retained ENSR International ("ENSR"), an environmental consultant, and initiated its own site investigation. Pl. Mot. Summ. J., Ex. B (document # 20–3).

ENSR concluded that the fuel oil had likely escaped from underground storage tanks ("USTs") that had been installed on the Museum's property in the 1960s or from the tanks that replaced them in the 1970s:

> Based upon the observed distribution of LNAPL [light non-aqueous phase liquid] measured in soil borings and monitoring wells during the site investigations . . . and available records provide by [the Museum], it is highly likely that the source of the release of the No. 4 fuel oil to the subsurface occurred from the former 1960 and/or 1970s Tanks, or associated piping, sometime between the late 1960's and 1986 . . . . [T]hese 10,000 gal [USTs] were originally located in the area of the Asian Art Export Wing which was constructed in 1986 on the museum property.

*Id.* The Museum reported ENSR's findings to the DEP and submitted an Immediate Action Plan on January 26, 2004. *Id.* Three days later, the DEP issued to the Museum a Notice of Responsibility ("NOR") pursuant to Mass. Gen. Laws ch. 21E, § 5 stating that the Museum was a potentially responsible party with liability

for the response costs. Pl. Mot. Summ. J., Ex. C (document # 20–4).

The Museum notified U.S. Fire of the Heritage claim on October 28, 2003. Pl. Mot. Summ. J., Ex. G (document # 20–7). U.S. Fire disclaimed any duty to defend the Heritage claim on the ground that Heritage's letter did not constitute a "suit." *Id.* On February 18, 2004, the Museum notified U.S. Fire that the DEP had issued an NOR and again requested a defense. *Id.* The Museum also encouraged U.S. Fire to reevaluate its initial denial of coverage in connection with Heritage's 2003 letter and urged U.S. Fire to explore settlement options. *Id.* Unlike U.S. Fire, ACE agreed to defend against the Heritages (subject to a reservation of rights).

On March 17, 2004, U.S. Fire decided to "participate" in the Museum's defense of the NOR and coordinate payments with ACE, subject to a reservation of rights. *Id.* U.S. Fire later limited its "participation" by capping reimbursement at $200 instead of the $475 hourly rate paid by the Museum to its defense counsel, arguing that the higher rate was unreasonable. *Id.* It then agreed to pay only 40% of that $200 per hour (ACE paid the remaining 60%). *Id.* Prior to this lawsuit, U.S. Fire did not actually pay any of the Museum's defense costs it had promised or extend coverage for the Heritage claim.[2]

On June 21, 2005, the Museum settled the Heritage claim for $300,000. Pl. Mot. Summ. J., Ex. D ¶4 (document # 20–5). Nonetheless, the Museum claims that investigatory and remedial activities remain ongoing. Moreover, additional oil has been rediscovered at Heritage Plaza in June 2007, which may lead to additional monitoring, reporting, and cleanup costs. *Id.*

## A. *The Policies*

In 1983, the Museum's predecessor, the Peabody Museum of Salem, purchased a primary liability insurance policy from U.S. Fire ("Policy") covering the period of December 19, 1983, to December 19, 1986. Monk Aff. Supp. Summ. J., Ex. 1 (document # 58–2). The policy required U.S. Fire to defend the Museum against "any suit against the insured seeking damages on account of such ... property damage ... to which this insurance applies, caused by an occurrence." *Id.* U.S. Fire further promised to indemnify the Museum for "all sums" the Museum became "legally obligated to pay as damages because of ... property damage." *Id.* Property owned, occupied, or rented to the Museum was excluded from coverage. *Id.*

Until December 19, 1985, when an "absolute pollution exclusion" was added,[3] the Policy contained a provision that excluded coverage for:

> bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water;

*Id.* However, there was an exception to the exclusion clause: *"this exclusion does not apply* if such discharge, dispersal, release or escape is *sudden and accidental." Id.* (emphasis added).

---

**2.** After the Museum filed its first motion for summary judgment on U.S. Fire's breach of its duty to defend, U.S. Fire paid $611.41 in reimbursement for the cost of defending against the NOR.

**3.** This December 19, 1985, endorsement excluded coverage for all pollution, including the "sudden and accidental" releases of pollutants that had been formerly included. Pl. Stmt. Undisp'd Facts, ¶9 (document # 57).

The Museum had a virtually identical policy from Aetna, predecessor to ACE, for the period from December 19, 1980, to December 19, 1983 ("ACE Policy"). Pl. Mot. Summ. J., Ex. F at 33 (documents # 20–7, 20–8). It contains a similar pollution exclusion clause and an identical "sudden and accidental" exception to that clause. *Id.*

Put simply, coverage here pivots on two questions—one involving the timing of the damage to the Heritage property, and the other the means by which the leak occurred. Coverage under the U.S. Fire policy depends upon *when* the damage to the neighboring property occurred—whether it was before or after December 1985 when the absolute pollution exclusion was in effect. In addition, coverage under both the U.S. Fire and the ACE policy pivot on the question of *how* the leakage occurred—whether it was "sudden and accidental."

## B. *The Source and Origin of the Oil*

### 1. *The Tanks*

A variety of USTs have been on the 161 Essex Street site. The first tank, installed in 1960, was a 10,000–gallon tank ("1960 tank") buried four feet below the surface and installed on a concrete slab. Pl. Stmt. Undisp'd Facts, Ex. 2 at 3 (document # 57–3). It was dug up in 1973 and replaced by two 10,000–gallon tanks ("1973 tanks") buried three feet below the surface on a new concrete slab constructed on top of the old slab. *Id.* at 4. Both tanks were connected to the boiler room by subsurface piping.

### 2. *Evidence of Oil in the Ground in June 1986*

In June 1986, the 1973 tanks were removed to make room for the Asian Arts

Export Wing ("Asian Arts wing") expansion at 161 Essex Street, and a new 10,-000–gallon tank ("1986 tank") was placed in a different location, twenty-two feet from the boiler room. *Id.* This 1986 tank was replaced in 2001 with a double-walled 20,000–gallon tank located sixty-five feet east of the boiler room. *Id.*

After the 1973 tanks had been removed, the construction company manager noticed the intrusion of oil into a corner of the excavation for the Asian Arts wing project. Monk Summ. J. Aff., Ex. 5 at 2 (document # 58–6).[4] The Museum decided not to remove any contaminated soil at that time. *Id.* According to minutes of a July 22, 1986 Architectural/Structural Job Meeting, the Museum intended to notify the City of Salem if further excavation showed a large amount of oil. Monk Summ. J. Aff., Ex. 8 ¶ 8 (document # 58–9). It did not.

Based on records provided by the Museum and the distribution of the oil measured in soil borings and monitoring wells, the Museum's experts conclude that this 1986 spill—whose significance they did not then understand—was part of the spill that had by then already migrated onto the Heritage property. The source was "the former 1960 and/or 1970 Tanks, or associated piping, sometime between the late 1960's and 1986." Pl. Mot. Summ. J., Ex. B at 6 (document # 20–3). ENSR determined that the size of the subsurface plume of oil that had spilled was approximately 10,000 square feet. *Id.* at 12. Prior to the remedial measures taken by Heritage in 2003, the plume of oil was not very mobile, "having approached a 'quasi-steady-state' distribution . . . subsequent to its apparently sudden release at some

---

4. Frank Duley, the Museum facilities manager in 1986, had no recollection of subsurface oil when the 1973 tanks were removed in 1986.

Pl. Mot. Summ. J., Ex. B at 6 (document # 20–3).

point during the operations of the 1960s or 1970s tanks." *Id.* at 14.

Peter Riordan ("Riordan"), a professional engineer in the fields of geotechnical engineering and ground water hydrology, whom the Museum retained, concluded that the 194 days between December 19, 1985 (when U.S. Fire's absolute pollution exclusion went into effect) and June 1986 (when the 1973 tanks were removed and oil discovered) would not have been sufficient to create a spill of the size reported. *Id.* Rather, Riordan agreed with ENSR that the source of the oil was the 1960 and 1973 tanks, that the release "commenced no later than 1979, and probably prior to the installation of the 1973 tanks," and "took place predominantly or completely prior to removal of the 1973 tanks" in 1986. Pl. Stmt. Undisp'd Facts, Ex. 2 at 9 (document # 57–3). Using computer modeling of the rate of oil flow through the soil, Riordan concluded that the oil took between 25 to 40 years to reach its maximum exposure. *Id.*

U.S. Fire's expert, David Lang ("Lang"), a licensed site professional in the field of hydrology, does not accept the conclusion that the oil at issue escaped from the 1960s or 1973 tanks because a release of that size "would have been noted by those present [and] would have been reported to the DEP ... or at least to [Museum] management." Pl. Stmt. Undisp'd Facts 2, ¶ 25 (document # 57). Rather, Lang concluded that that the contamination resulted from the spill reported to the DEP in 1987, described below.

### 3. *1987 Oil Spill*

On November 25, 1987, the Museum notified the DEP that # 4 fuel oil had been released because of a ruptured delivery line from a UST. Pl. Mot. Summ. J., Ex. B at 6 (document # 20–3). The exact amount of oil spilled is unknown, but the amount reported in DEP records is less than ten gallons. Monk Summ. J. Aff., Ex. 10 (document # 58–11). The spill was in the vicinity of the boiler house located at 161 Essex Street and is listed in DEP documents as occurring at "Charter Street" (close to the former location of the 1960 and 1973 tanks). *Id.;* Aylward Summ. J. Aff., Ex. 4 at 6 (document # 52–5). The spill occurred during the actual construction of the Asian Arts wing. At a December 8, 1987, construction meeting, the contractor characterized the spill as a "serious oil leak" that would be a "major hindrance" to remaining work for that year, and stated that it had begun removing the contaminated soil. Monk Summ. J. Aff., Ex. 11 at 3 (document # 58–12).

Lang disputes the size of the 1987 spill, suggesting that it was larger than the Museum indicates. A ten-gallon spill, he argues, would not require notification of the DEP. Aylward Summ. J. Aff., Ex. 4 at 6 (document # 52–5). He also notes that because oil delivery lines operate at high pressure, more oil must have spilled in 1987. Pl. Stmt. Mat. Facts, Ex. 1 at 4 (document # 57–2).

There is no DEP information about cleanup of this spill. Pl. Mot. Summ. J., Ex. B at 7 (document # 20–3). However, there is an invoice from a contractor detailing the removal of 0.5 yards of contaminated soil, 110 gallons of waste oil, and another 150 "P" (presumably, pounds) of dirt. Monk Summ. J. Aff., Ex. 12 (document # 58–13). At a December 22, 1987 construction meeting, the contractor noted that the "serious oil leak" was completely cleaned up, and the minutes reflect that the spill was "resolved." Monk Summ. J. Aff., Ex. 13 at 3 (document # 58–14). The contractor cleaned up the spill at no additional cost to the Museum. Monk Summ.

J. Aff., Ex. 14 (document # 58–15).[5]

## III. *PROCEDURAL HISTORY*

The Museum filed its original complaint on June 5, 2006, in Essex Superior Court. U.S. Fire removed the case to federal court shortly thereafter and filed an answer on July 21, 2006. U.S. Fire filed a third-party complaint against prior insurer ACE on August 7, 2006, and ACE answered on October 12, 2006.

The Museum moved for partial summary judgment on October 10, 2007. I granted the Museum's motion, holding that U.S. Fire breached its duty to defend the Museum against the NOR. I deferred the issue raised by U.S. Fire of whether the October 17, 2003, letter from Heritage also constituted a suit triggering the duty to defend under Mass. Gen. Laws ch. 21E, § 4A until after the question of indemnity was resolved. Electronic Orders, 12/19/2007, 02/21/2008.[6]

All parties have moved for summary judgment on the issue of indemnity. The Museum argues that (1) U.S. Fire as a matter of law cannot meet its burden to prove that any release of oil was not "accidental or sudden" or was otherwise excluded from the policy; and (2) no reasonable jury could conclude that the oil at issue was a result of the 1987 release, rather than a spill occurring before December 1985.

U.S. Fire argues that (1) the Museum has provided no evidence that the damage to the Heritage property dates from the 1983 through 1985 coverage period of the policy; (2) there is no evidence that the discharge of oil was "sudden and accidental" to trigger the exception clause of the pollution damage exemption of the policy; (3) in the alternative, if there was damage during the policy period that was sudden and accidental, U.S. Fire's indemnity of the damages should be pro-rated to the two years of the Policy.

Third-party defendant ACE argues that (1) U.S. Fire cannot prove the occurrence was "sudden and accidental" to trigger ACE's liability; and (2) U.S. Fire cannot prove that the damage to Heritage happened before December 19, 1983, during the time the ACE Policy was in effect.

## IV. *DISCUSSION*

### A. *Choice of Law*

 A federal court sitting in diversity jurisdiction applies the choice-of-law rules of the forum state. *Borden v. Paul Revere Life Ins. Co.*, 935 F.2d 370, 375 (1st Cir.1991) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 82

---

**5.** Two other spills were discovered in 1998, but neither of these spills are alleged to be the source of the pollution on the Heritage site. Pl. Mot. Summ. J., Ex. B at 6 (document # 20–3); see also Aylward Summ. J. Aff., Ex. 4 at 6 (document # 52–5). The first spill was discovered while removing a 5,000–gallon UST at 132 Essex Street (500 feet northeast of the Boiler House). Pl. Mot. Summ. J., Ex. B at 5 (document # 20–3). The Museum found contaminated soil and on July 10, 1998, notified the DEP. *Id.* Eventually, the museum cleaned up 365 gallons of # 2 fuel oil and 0.5 cubic yards of soil. *Id.* Post-cleanup soil sampling produced a rating of "no significant risk" of contamination on site, and a class A–1 Response Action Outcome ("RAO") was

submitted to the DEP on September 9, 1998. *Id.*

The second spill occurred on August 8, 2008, when a 1,000–gallon # 2 fuel oil UST was removed from 133 Essex Street. *Id.* The Museum removed 0.9 cubic yards of soil during the cleanup. *Id.* Soil samples after cleanup again produced a level of "no significant risk," and a class A–2 RAO was submitted to the DEP on October 27, 2000.

**6.** I also ordered the parties to file a joint statement detailing their agreement or disagreement over the amount of potential damages. *Id.* They never did so.

L.Ed. 1188 (1938)). "Where parties have agreed to the choice of law, this court is free to forego an independent analysis and accept the parties' agreement." *Hershey v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 317 F.3d 16, 20 (1st Cir.2003). All parties cite to Massachusetts case law to support their claims, including those under contract law. This Court need inquire no further into choice of law. *See McAdams v. Mass. Mut. Life Ins. Co.*, 391 F.3d 287, 298 (1st Cir.2004).

### B. *Summary Judgment Standard*

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Once the moving party demonstrates the " 'absence of evidence to support the nonmoving party's case,' the burden of production shifts to the nonmovant." *Dow v. United Bhd. of Carpenters*, 1 F.3d 56, 58 (1st Cir.1993) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). The nonmovant must then "affirmatively point to specific facts that demonstrate the existence of an authentic dispute." *McCarthy v. Nw. Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir.1995). The court must:

> 'view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor,' but paying no heed to 'conclusory allegations, improbable inferences, [or] unsupported speculation.' If no genuine issue of material fact emerges, then the motion for summary judgment may be granted.

*Id.* (citations omitted). For issues on which the nonmoving party bears the ultimate burden of proof, he or she "must present definite, competent evidence to rebut the motion." *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 822 (1st Cir.1991).

"A fact is material if it has the potential of determining the outcome of the litigation." *Maymi v. P.R. Ports Auth.*, 515 F.3d 20, 25 (1st Cir.2008). To proceed to trial, a material fact does not need to be resolved conclusively in favor the party asserting it; "all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

All parties have filed cross motions for summary judgment. I will discuss them in the context of the two controversies involved—*Museum v. U.S. Fire*, and *U.S. Fire v. ACE*. In each of these two suits, U.S. Fire bears the burden of proof.

### C. *Museum v. U.S. Fire*

The Museum and U.S. Fire disagree on the meaning of my order of December 19, 2007. Following the Court's approach in *Arrow Auto. Indus., Inc. v. Liberty Mut. Ins. Co., et al.*, 10 Mass. L. Rptr. 380, 1999 WL 707718 (Mass.Super.1999), I ordered that the Museum produce credible evidence of a covered occurrence before shifting the burden to U.S. Fire to prove the occurrence is not covered. The Museum argues that according to my order it only needs to produce credible evidence of *when* the damage occurred, namely that the property damage to the Heritage site occurred during the covered period. U.S. Fire counters that the Museum must also produce credible evidence of *how* the damage occurred—that it was the result of a "sudden and accidental" release before the burden of proof shifts to U.S. Fire. Def.

Mem. Supp. Summ. J. at 4 (document # 50).[7]

■ For reasons detailed below, neither position is correct. Although less than clear, the intent of my order was to specify how evidence would be presented at trial as did the Court in *Arrow Automotive.* The distribution of the parties' burdens at summary judgment, however, is different. Massachusetts law is unambiguous that once the insurer breaches its duty to defend, it bears the entire burden of proving non-coverage, including, in this case, the burden of showing that the release was not the result of a sudden or accidental discharge. *Polaroid,* 414 Mass. at 764 n. 22, 610 N.E.2d 912; *Highlands Ins. Co. v. Aerovox Inc.,* 424 Mass. 226, 230 n. 6, 676 N.E.2d 801 (1997) ("The shifting of the burden to the insurer . . . is necessary to protect the insured because the failure to defend might make it more difficult for the insured to prove that the underlying claim falls within the insurance coverage."); *Arrow Automotive,* 1999 WL 707718, at *1.

### 1. *Burden Shifting Framework*

■ The general rule is that the insured bears the initial burden of proving the loss is within the description of the risks covered. *Highlands,* 424 Mass. at 230, 676 N.E.2d 801; *see also Nascimento v. Preferred Mut. Ins. Co.,* 513 F.3d 273, 277 (1st Cir.2008). If the insured satisfies this burden, then the insurer must prove that an exclusion applies in order to avoid coverage. *Id.* at 277. *See also Great Sw. Fire Ins. Co. v. Hercules Bldg. & Wrecking Co.,*

35 Mass.App.Ct. 298, 302, 619 N.E.2d 353 (1993). If the insurer demonstrates that a coverage exclusion applies, the burden shifts back to the insured to prove that the loss fits into an exception to the exclusion. *Highlands,* 424 Mass. at 231, 676 N.E.2d 801.

But the general rule does not apply where, as here, an insurance company breaches its duty to defend. *Polaroid,* 414 Mass. at 764, 610 N.E.2d 912. Under those circumstances, the insurer bears the entire burden of proving that coverage is excluded and that no exception to that exclusion applies. The Supreme Judicial Court reasoned that the insurer bear this burden as a liability for placing its insured in an inferior position in defending any suits, and to encourage insurance companies to defend their insureds. *Id.* Delays in determining an insurer's defense obligation, especially in the case of a government finding of responsibility for pollution damage, can make it "more difficult for an insured to prove that the underlying claim that it settled fell within policy coverage." *Id.* The SJC reaffirmed this approach in *Highlands:*

> In [Polaroid], we did place the burden of proof on the insurer in those cases where the insurer is in breach of its duty to defend the insured. We expressly stated that that determination was made irrespective of which party would normally bear that burden in the absence of a breach of the duty to defend. The shifting of the burden to the insurer in those cases is necessary to protect the

---

**7.** Although U.S. Fire now argues against this allocation of the burden, it had every reason to expect it. In fact, it argued for the application of *Arrow Automotive* in lieu of a strict *Polaroid* burden-shifting in the event that I found that it had breached its duty to defend:

> U.S. Fire requests and recommends that if such an order is to enter, it be clear that plaintiff retains the burden of production to

present prima facie evidence that discharges of pollution occurred during the 1983–86 U.S. Fire policy, subject to U.S. Fire's burden of proving that any such discharges were, in fact, not 'sudden and accidental' and therefore excluded.

Def.'s Letter to Hon. Nancy Gertner, Nov. 30, 2007 (document # 38–1).

insured because the failure to defend might make it more difficult for the insured to prove that the underlying claim falls within the insurance coverage.

*Id.* at 230 n. 6, 676 N.E.2d 801 (citations omitted). *See also, Swift v. Fitchburg Mut. Ins. Co.,* 45 Mass.App.Ct. 617, 625, 700 N.E.2d 288 (1998); *Palermo v. Fireman's Fund Ins. Co.,* 42 Mass.App.Ct. 283, 290, 676 N.E.2d 1158 (1997).

The first court to wrestle with *Polaroid* was *Arrow Automotive,* but in connection with a trial motion in limine rather than a summary judgment proceeding. In that context, the court, concerned that a straightforward application of *Polaroid* would require the insurer to prove a negative (that no covered discharges occurred) "in a vacuum," modified the evidentiary standard, to a limited degree:

> [The insured] will have the burden of producing credible evidence demonstrating that releases of TCE did occur between 1968 and 1971. This is a burden of production only, not a burden of proof. If such evidence is presented, then the burden of proof will be on [the insurer] to demonstrate that there is no coverage.

*Arrow Automotive,* 1999 WL 707718, at \*5. That this was an issue of trial procedure, and not an alteration of the *Polaroid* rule was clear. The Court expressly cited to a trial judges' "wide discretion on the question of the order of the presentation of evidence" to justify his departure from *Polaroid* and subsequent cases. *Id.* at \*4 (citing *Commonwealth v. Rancourt,* 399 Mass. 269, 277, 503 N.E.2d 960 (1987)).[8] My order paralleled the Court's in *Arrow Automotive:*

> [T]he burden-shifting rule enunciated in *Polaroid Corp. v. Travelers Indem. Co.,* 414 Mass. 747, 610 N.E.2d 912 (1993), applies: an insurer that wrongfully declines to defend a claim will have the burden of proving that the claim was not within the policy's coverage. *Id.* at 764, 610 N.E.2d 912. However, the Court will adopt Judge Van Gestel's approach in *Arrow Automotive Indus. Inc. v. Liberty Mut. Ins. Co.,* 1999 WL 707718 (Mass.Super. June 24, 1999), whereby Plaintiff will have the burden of producing credible evidence demonstrating that a coverable occurrence took place during the term of the insurance policy; Defendant will then have the burden of proving that there is no coverage.

8. The court explained that it meant to "borrow from the law in the employment discrimination field . . . and establish a two-stage order of proof." *Id.* at \*4–5 (citing *Blare v. Husky Injection Molding Sys. Boston, Inc.,* 419 Mass. 437, 646 N.E.2d 111 (1995)). In an employment discrimination claim, the plaintiff must make a prima facie showing in order to survive summary judgment. *See Blare,* 419 Mass. at 441, 646 N.E.2d 111. If the court's "credible evidence" standard were read as a substantive test that the plaintiff must meet to survive summary judgment stage, it would run the risk of rolling back the full burden that the SJC placed on insurers breaching their duty to defend in *Polaroid. See* Mass. CLE 9–I, *Obligations of Insurer and Policyholder* (2004) (describing as "questionable whether this two-stage order of proof is

fully consistent with *Polaroid*" because the SJC may have intended "to allocate to the defense-breaching insurer not only the burden to show that a given set of circumstances falls outside the coverage, but also to show what set of circumstances the claimant would have set out to prove").

In any event, the trial presentation issues that the court in *Arrow Automotive* raised are not applicable to summary judgment proceedings. The employment discrimination burden shifting paradigm set out in *McDonnell Douglas v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), for example, applied to summary judgment proceedings, but it is not used to frame jury instructions at trial. *U.S. Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 715, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983).

Electronic Order Granting Mot. Summ. J. 12/19/2007. Although I did not indicate in my order whether the Museum's credible evidence showing applied at trial alone or also at the summary judgment stage, in order to hew closely to *Polaroid*, it must be understood as referring only to the order of presentation of evidence at trial. On this reading, the burden is entirely on the defendant to show that the property damage was not covered by the policy.[9] *See, e.g. Swift*, 45 Mass.App.Ct. at 625, 700 N.E.2d 288 (allocating the burdens of proof in a summary judgment proceeding.)

## 2. *Defendant's Burden of Proving Non–Coverage*

For U.S. Fire to prevail, it must prove by a preponderance of the evidence either (1) that the property damage to the Heritage site occurred after the pollution exclusion went into effect on December 19, 1985, or (2) that the release was not sudden. As to the first, U.S. Fire has advanced enough evidence to dispute exactly when the spill might have happened. While Peabody Essex maintains that the spill originated with the 1960 UST or the 1973 USTs or associated piping, reaching the Heritage property before December of 1985, U.S. Fire's experts credibly argue that the Heritage damage can be fully explained by the 1987 spill. As to the second issue, however, no reasonable jury could find that the spill was the result of a gradual release. There is simply no evidence on this issue, either way.

### a. Evidence that the Damage Happened Outside the Policy Period

U.S. Fire disputes the Museum's argument that the spill must have occurred before 1986. Its expert concludes that no spill of that size could have occurred before 1986 because neither the Museum's director of facilities nor the City of Salem Fire Department noticed any oil contamination when the 1973 tanks were removed in June of 1986. U.S. Fire also points to an absence of documentary evidence of any spill on Museum property before 1986.

It argues that, contrary to the documentary evidence, the 1987 spill was not small and likely caused the property damage to the Heritage site. If the spill was as small

9. Both parties have briefed summary judgment under the assumption that my order required the plaintiff to meet its burden of producing "credible evidence demonstrating that [1] a coverable occurrence took place [2] during the term of the insurance policy." Electronic Order Granting Summ. J. 12/19/2007. Even if *Arrow Automotive* does require such a burden, the Museum has met it.

The U.S. Fire policy covers "property damage" that is "caused by an occurrence." Monk Aff. Supp. Summ. J., Ex. 1 (document # 58–2). Occurrence as defined by the policy is "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured." Compl. ¶ 8; Answer ¶ 8. "Property damage" is defined to include "physical injury to or destruction of tangible property which occurs during the policy period."

Compl. ¶ 9; Answer ¶ 9. The policy also absolutely excludes pollution damage that occurred after December 19, 1985. Pl. Stmt. Mat. Facts ¶ 10 (document # 57) (property owned by the Museum is excluded from policy coverage); Monk Summ. J. Aff., Ex. 1 at 21 exclusion (k) (document # 58–2) (same).

The parties do not dispute that a subsurface fuel oil spill on the Museum's land damaged the Heritage site; they dispute *how* and *when* that damage occurred. The "how"—whether "sudden and accidental" or gradual—is clearly U.S. Fire's burden under *Polaroid*. The only question is whether the Museum has produced credible evidence of the "when"— whether damage at issue here occurred to the Heritage site by December 19, 1985. There is no question that based upon the Museum's environmental consultant report, the ENSR report, and the Riordan affidavits, the plaintiff has done so.

as the Museum claims in its report to the DEP (one to ten gallons), Lang argues that there would have been no need to report it at all. Aylward Summ. J. Aff., Ex. 4 at 6 (document # 52–5). Furthermore, Lang points out that oil lines operate under high pressure and a ruptured line would have spilled more than 10 gallons of oil. Pl. Stmt. Mat. Facts, Ex. 1 at 4 (document # 57–2). He also cites the plaintiff's construction reports as evidence that the spill was larger than the Museum believes. The Museum counters with DEP records, meeting minutes and deposition of its facility director.

■ Since U.S. Fire has put forth evidence the damage to Heritage derived from the 1987 spill, and therefore after the policy period, summary judgment on this issue is not appropriate.

### b. Evidence that the Damage Was Not Sudden or Accidental [10]

U.S. Fire, having breached its duty to defend, bears the entire burden of proving that the release of oil was not sudden or accidental. *Polaroid,* 414 Mass. at 764 n. 22, 610 N.E.2d 912. Since neither party alleges that the release of fuel oil was intentional, U.S. Fire's focus must be on proving that the release was not sudden— that it was gradual. *See Lumbermens Mut. Cas. Co. v. Belleville Indus. Inc.,* 407 Mass. 675, 680, 555 N.E.2d 568 (1990). The event around which the timing inquiry centers is "neither the cause of the release" nor "the damage caused by the release"; rather, "[i]t is the release itself that must have occurred suddenly, if the exception is to apply." *Goodman v. Aetna Cas. & Sur. Corp.,* 412 Mass. 807, 811, 593

N.E.2d 233 (1992); *see also Lumbermens,* 407 Mass. at 679, 555 N.E.2d 568. It is "the abruptness [or lack thereof] of the commencement of the release or discharge"— the breaking of the barrier between the pollutant and the outside world—"that is the crucial element in determining whether an event qualifies as 'sudden.'" *Goodman,* 412 Mass. at 811, 593 N.E.2d 233 (quoting from *Lumbermens,* 407 Mass. at 679, 555 N.E.2d 568) (emphasis omitted).

In the case at bar, there is scant evidence on how the release occurred. There are no records of the oil usage at the Museum for the period before 1986. Aylward Summ. J. Aff., Ex. 4 at 7 (document # 52–5). No photographs of the 1960 or 1973 tanks were taken at the time of removal. *Id.* There are no tank tightness test records. *Id.* The ENSR report contains one sentence on the "apparently sudden release" of the oil. Pl. Mot. Summ. J., Ex. B at 14 (document # 20–3). The tanks were removed in 1986 and 1973 and were scrapped long ago. Finally, the Museum built the Asian Arts wing over much of the former site of the tanks.

Despite the thinness of the record, U.S. Fire advances two—and only two—pieces of evidence to support its contention that the release was not sudden: the deposition testimony of Daniel Folan and the opinion of David Lang.

Folan, the author of the ENSR report that called the release "sudden," admitted in his deposition that he does not know how the release occurred or what led him to his original conclusion. Aylward Summ. J. Aff., Ex. 2 at 9 (document # 52–3). He acknowledged: "I don't believe we have evidence to indicate whether it was sudden

---

10. The parties do not dispute that fuel oil is a pollutant excluded from coverage under the U.S. Fire and ACE policies. Massachusetts courts have consistently held oil to be a "pollutant" within policy language. *See, e.g., Nascimento v. Preferred Mut. Ins. Co.,* 478

F.Supp.2d 143, 148 (D.Mass.2007), *aff'd* 513 F.3d 273 (1st Cir.2008) (citing cases). Therefore, this case turns on the sudden-and-accidental exception to the pollution exclusion clause.

or not." *Id.* U.S. Fire suggests that Folan's reversal is evidence that the "apparently sudden release" line in his report is meaningless. That may be true, but Folan's repudiation of his own report is not evidence that the release was gradual. Indeed, his testimony buttresses the conclusion that that U.S. Fire cannot possibly meet its burden of proof.

■ Lang, U.S. Fire's expert, theorizes that the release *must have* resulted from corrosion and therefore was gradual: "[t]he large horizontal and vertical distribution … the sheer volume of this release suggests that the cause of the pollution was a line leak or small corrosion tank leak that existed for a long time." Def. Br. Supp. Summ. J. at 13 (document #50); Aylward Summ. J. Aff., Ex. 4 at 7 (document #52-5). Lang's conclusions, however, are wholly speculative under *Goodman.* Moreover, the volume and duration of the release was not sufficient to suggest that a release was gradual. *Goodman,* 412 Mass. at 813, 593 N.E.2d 233.

In *Goodman,* the Supreme Judicial Court overturned the trial court's holding that the rate at which the gasoline flowed from a leak, precluded a finding of "suddenness." [11] *Goodman,* 412 Mass. at 811-12, 593 N.E.2d 233. The plaintiff sued its insurer to cover damage to the neighboring property caused by gasoline leaking into the groundwater. *Id.* at 808, 593 N.E.2d 233. A storage tank with a hole in it was the cause. *Id.* at 810, 593 N.E.2d 233. The parties agreed that gasoline flowed out of the hole at approximately 0.2 gallons per minute and migrated through the soil at 0.3 feet per day. *Id.* Based on this rate of flow and the eighteen-month duration of the leak, the trial court con-

cluded that the release was too protracted to be sudden and therefore did not come within the exception to the pollution exclusion clause granting summary judgment to the insurer. *Id.* at 810-11, 593 N.E.2d 233. The SJC reversed:

> "The (undisputed) fact that the discharge of the pollutants occurred over a lengthy period of time does not automatically mean that the suddenness element has not been met, and it was wrong to decide the case solely on that point. But until all the circumstances of the release in this case are fully developed, no adequate determination can be made as to whether the 'sudden and accidental' exception is applicable."

*Id.* at 813, 593 N.E.2d 233.

On this record, no reasonable jury could find either that the release was sudden or that it was not. Because the defendant bears the burden of proof as to non-suddenness, summary judgment is GRANTED for the Museum on this issue.

### 3. U.S. Fire's Motion on Allocation of Damages

■ U.S. Fire has moved for summary judgment on the issue of damages. It argues that its indemnity obligations should be pro-rated to two years (the duration of its coverage) in the event that the factfinder decides that the pollution damage occurred over a longer period. It notes that the issue of allocation is an unsettled question of state law and presses for a decision now.[12] Significantly, the First Circuit in *Boston Gas v. Century Indem. Co.,* 529 F.3d 8 (1st Cir.2008), certified a question to the SJC as to how to allocate damages among multiple triggered policies. No. SJC-10246, argued 01/08/2009. I decline to rule while that

---

11. In *Goodman,* the insurance company defended the insured and reserved its rights. 412 Mass. at 808, 593 N.E.2d 233. Therefore, the burden was on the insured to show that the release *was* sudden.

12. U.S. Fire asserts that a ruling in its favor would render moot its claim for equitable contribution against ACE.

case is still pending and reserve the issue until the SJC has issued its decision.[13] Trial need not be delayed however; the parties can craft appropriate questions for the jury on which allocation could later be based.[14]

Since the parties have yet to stipulate for damages and the issue does not require immediate resolution, I will continue to reserve the question.

### D. U.S. Fire v. ACE

Third-party defendant ACE moves for summary judgment, arguing (1) U.S. Fire cannot possibly meet its burden of proving that the pollution damage was the result of a "sudden and accidental" occurrence to qualify as an exemption to ACE's pollution exemption clause, and (2) that U.S. Fire cannot show that the damage to the Heri-

tage site occurred during the period of 1980–1983, when the ACE policy was in effect. It need prevail on only one of these arguments to qualify for a finding of summary judgment in its favor.

ACE's liability policy, identical to U.S. Fire's, contains a pollution exclusion clause. Pl. Mot. Summ. J., Ex. F at 34 (document # 20–7). U.S. Fire bears the ordinary burden of proof by a preponderance of the evidence.

■ As I have concluded that summary judgment for the Museum is appropriate on the "sudden and accidental" issue in the case in chief, I must GRANT summary judgment for ACE, as well. If no reasonable jury could find that the release was not sudden, then correspondingly, no reasonable jury could find that the release was sudden. This has the peculiar result

---

13. The only Massachusetts ruling directly on point is an appeals court ruling in *Rubenstein v. Royal Ins.*, 44 Mass.App.Ct. 842, 694 N.E.2d 381 (1998) (*"Rubenstein I"*) aff'd on other grounds, 429 Mass. 355, 708 N.E.2d 639 (1999) (*"Rubenstein II"*). *Rubenstein I* involved an oil spill and resultant pollution damage that occurred some time before October 1969 but was not cleaned up until 1988 or 1989. 44 Mass.App.Ct. at 852, 694 N.E.2d 381. The insurance policy was in effect from 1969 through 1972. *Id.* The policy obligated the insurer to cover "all sums which the insured shall become legally obligated to pay as damages." *Id.* Under those terms, the lower court held that where multiple insurance policies are triggered, liability was joint and several. *Id.* The appellate court upheld the lower court's ruling that the occurrence covered by the policy was the injurious exposure to the hazardous materials during the policy period. *Id.* It also held that since the policy contained the "all sums" language and there was no bar against the insurer seeking contribution from other insurers, there was no error in failing to allocate liability among the insurers based on the policy periods. *Id.; see also A.W. Chesterton Co. v. Mass. Insurers Insolvency Fund,* 445 Mass. 502, 506 n. 3, 838 N.E.2d 1237 (Mass.2005) (refusing to address the issue of "pro rata" or "all sums" methods

of allocation but citing with approval the appeals court's two decisions in *Rubenstein I* and *Chicago Bridge & Iron v. Certain Underwriters at Lloyd's,* 59 Mass.App.Ct. 646, 797 N.E.2d 434 (2003)). Thus, the current law in Massachusetts is that when "each policy provides indemnity for the insured's entire liability ... each insurer is jointly and severally liable for the entire claim." *Rubenstein I,* 44 Mass.App.Ct. at 852, 694 N.E.2d 381; *accord, Liberty Mut. Ins. Co. v. Black & Decker Corp.,* 383 F.Supp.2d 200, 215 (D.Mass.2004).

14. In my prior order granting partial summary judgment, I deferred the question of whether a private demand served pursuant to Mass. Gen. Laws ch. 21E, § 4A constituted a suit triggering the duty to defend under Massachusetts insurance law where an NOR has later issued. I previously held that the NOR constituted a suit under Massachusetts law. After the NOR was issued, the firm representing the Museum billed some of its hours as defending the Museum under the § 4A letter and some of its hours under the NOR. U.S. Fire argues that it is responsible for the NOR fees only and not the § 4A fees. The Museum responds that following the issuance of the NOR, all attorney's fees would have accrued in defense of the NOR regardless of how they were billed.

of U.S. Fire losing partially or wholly in both disputes for exactly the opposite reasons: It cannot prove that the release was gradual in the Peabody Essex case and it cannot prove that the release was sudden in the ACE case.

## V. CONCLUSION

For the reasons stated above, U.S. Fire's motion for summary judgment (document # 49) is DENIED in toto; the Museum's motion for summary judgment (document # 55) is GRANTED IN PART on the issue of suddenness and DENIED IN PART on the issue of the timing of the spill; and ACE's motion for summary judgment (document # 53) is GRANTED. I continue to RESERVE on the issues of whether a demand letter under Mass. Gen. Laws ch. 21E, § 4A constitutes a suit and how damages in this case should be allocated.

Trial is scheduled for Monday, June 15, 2009, at 9:00 a.m.

SO ORDERED.