# United States Court of Appeals
## For the First Circuit

Nos. 13-1528, 13-1602

PEABODY ESSEX MUSEUM, INC.,

Plaintiff, Appellee/Cross-Appellant,

v.

UNITED STATES FIRE INSURANCE COMPANY,

Defendant/Third-Party Plaintiff, Appellant/Cross-Appellee,

v.

CENTURY INDEMNITY COMPANY,

Third-Party Defendant, Appellee.

———————————

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nancy Gertner, U.S. District Judge]
[Hon. Nathaniel M. Gorton, U.S. District Judge]

———————————

Before

Howard, Chief Judge,
Selya and Stahl, Circuit Judges.

———————————

        Thomas M. Elcock, with whom Mitchell S. King and Prince Lobel Tye LLP were on brief, for appellant/cross-appellee.
        Martin C. Pentz, with whom Jeremy A.M. Evans and Foley Hoag LLP were on brief, for appellee/cross-appellant.
        Brian G. Fox, with whom Siegal & Park was on brief, for third-party defendant, appellee.

September 4, 2015

HOWARD, **Chief Judge**.  Some decades ago, a substantial oil spill occurred on the Salem, Massachusetts property of plaintiff Peabody Essex Museum ("the Museum").  That pollution eventually migrated to the land of a down gradient neighbor, Heritage Plaza, which discovered the subsurface contamination in 2003.  Heritage Plaza notified the Museum in late 2003, and the Museum gave prompt notice to both the state environmental authorities and its insurer, defendant United States Fire Insurance Company ("U.S. Fire").  In 2006, the Museum filed a coverage suit against U.S. Fire and eventually secured a sizable judgment in 2013.  The parties now challenge numerous district court rulings, and several of the insurance issues are governed by state law under Boston Gas Co. v. Century Indemnity Co., 910 N.E.2d 290 (Mass. 2009), a decision which rejected joint and several liability in progressive pollution cases in favor of pro rata allocation of indemnity, including for self-insured years on the risk.

After careful review, we affirm the challenged rulings related to insurance coverage but reverse a finding of Chapter 93A liability against U.S. Fire under Massachusetts law.

**I.**

The surrounding facts are well-rehearsed in the district court orders below.  See, e.g., Peabody Essex Museum, Inc. v. U.S. Fire Ins. Co., 623 F. Supp. 2d 98 (D. Mass. 2009); Peabody Essex

Museum, Inc. v. U.S. Fire Ins. Co., No. 06-11209-NMG, 2012 WL 2952770, at *1 (D. Mass. July 18, 2012). A brief synopsis is enough to set the stage.

The principal parties share a contractual relationship under a comprehensive general liability policy which, as pertinent here, had a policy period that extended from December 19, 1983 to December 19, 1985. Generally speaking, the policy covered property damage occurring during that two-year period as long as the damage arose out of a sudden and accidental discharge of pollutants.[1] Under the policy, U.S. Fire also promised to defend the Museum from any suit seeking damages against it on account of any covered property damage and to investigate any claim as it deemed expedient.

Once the Museum received notice of the pollution damage from Heritage Plaza in 2003 ("the private demand"), it retained the Ropes & Gray law firm as legal counsel and ENSR International as an environmental consultant. The Museum confirmed the existence of subsurface oil pollution on its property and immediately notified the Massachusetts Department of Environmental Protection

---

[1] The 1983-1985 policy excluded coverage for all property damage arising out of the discharge, dispersal, release or escape of pollutants into the ground. But an exception to that exclusion reserved coverage for "sudden and accidental" discharges. See Peabody Essex Museum, 623 F. Supp. 2d at 102-03. A subsequent U.S. Fire policy incorporated an absolute pollution exclusion provision and, thus, is not relevant to this litigation.

of the pollution.  The Department, in turn, issued the Museum a Notice of Responsibility in early 2004 ("the public claim"), and ENSR continued its site investigation work throughout 2004.  In its Initial Site Investigation Report completed that November, ENSR identified several isolated spills that had occurred on the Museum's property over the years.  ENSR concluded, however, that the likely cause of the pollution involved one or more of three oil storage tanks or their pipelines previously buried on the Museum's property: a 10,000-gallon tank had been installed in the early 1960s and removed in 1973, and two 10,000-gallon tanks had been installed in 1973 and removed in June 1986.

Meanwhile, the Museum notified U.S. Fire of both the private demand, in October 2003, and the public claim, in February 2004.  U.S. Fire denied a duty to defend for the private demand but accepted defense for the public claim with a reservation of rights.  Despite tendering both legal and environmental consultant bills to U.S. Fire in April 2005, the Museum received no payment for the defense of the public claim -- the one that U.S. Fire had agreed to defend.  In June 2006, the Museum filed a four-count complaint against U.S. Fire in state court, alleging that U.S. Fire had breached its contractual duties to investigate the pollution claims and to defend and indemnify the Museum in connection with both the private demand and the public claim (counts I and II).  The Museum also alleged that U.S. Fire had

violated state consumer protection laws, Mass. Gen. Laws ch. 93A, § 2, and certain common law duties owed to its insured (counts III and IV). At the behest of U.S. Fire, the case was removed to federal court where it filed a third-party complaint for equitable contribution against another of the Museum's insurers, ACE Property & Casualty Insurance.

The extensive, multi-phase litigation included several rounds of summary judgment proceedings and a jury trial resolving indemnity issues. About midway through the litigation, the Massachusetts Supreme Judicial Court ("SJC") decided Boston Gas Co., 910 N.E.2d 290, to which the district court moored its decision on allocation of liability between U.S. Fire and the Museum as self-insured on the risk after December 19, 1985.[2] In the end, the district court's 2013 judgment required U.S. Fire to pay the Museum over $1.5 million, including punitive damages under Chapter 93A, attorney's fees, costs, and statutory interest.

Our review of the various rulings on appeal is largely de novo, and we abide by the well-established summary judgment standards. Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). We are not restricted by the district court's analyses and may affirm on any independent ground made

---

[2] The parties agree that the operative language in the U.S. Fire policy does not meaningfully differ from that at issue in Boston Gas.

manifest in the record.  See Jones v. Secord, 684 F.3d 1, 5 (1st Cir. 2012).  Where appropriate, we identify other review standards along the way.

## II.

U.S. Fire first appeals the district court's 2007 order that it breached its duty to defend against the public claim, and thus state law required it to bear the trial burden of proving no coverage.  See Polaroid Corp. v. Travelers Indem. Co., 610 N.E.2d 912, 922 & n.22 (Mass. 1993) ("[A]n insurer that wrongfully declines to defend a claim [must bear] the burden of proving that the claim was not within its policy's coverage" including, in pollution cases, "the existence or nonexistence of a sudden and accidental discharge.").  Following this Polaroid burden-shifting rule, the district court set forth the anticipated trial procedure in which the Museum was expected to produce credible evidence demonstrating that an occurrence took place during the term of the insurance policy, and then U.S. Fire would bear the burden of proving no coverage.  Electronic Order (Gertner, J., Dec. 19, 2007); see Peabody Essex Museum, 623 F. Supp. 2d at 106-10 (clarifying how the Polaroid burden-shifting rule applies in the summary judgment context).[3]

---

[3] The district court held in abeyance the issue of whether U.S. Fire also had a duty to defend on the Heritage Plaza private demand.  See Electronic Order (Gertner, J., Dec. 19, 2007). Eventually, the Museum settled the private demand for $300,000.

U.S. Fire attacks this summary judgment order on several fronts, all aimed at foreclosing application of the _Polaroid_ burden-shifting rule.  This is understandable in light of the cascade of practical effects that _Polaroid_ had throughout this litigation, especially given the dearth of evidence showing how the polluting event occurred. However, the district court's breach ruling -- grounded in U.S. Fire's categorical failure for approximately two years to make any payment for defense costs -- is unassailable on this record.  Only a few snapshots of the undisputed facts are necessary to show why.[4]

U.S. Fire agreed in March 2004 to honor its contractual duty to defend the public claim under a reservation of rights and then paid nothing to its insured until cornered by the Museum through its October 2007 motion for summary judgment.  From the outset, U.S. Fire protested the hourly rate charged by Ropes &

---

The district court subsequently determined that while the _Polaroid_ burden-shifting rule applied to the settlement figure, an open question remained on whether the private demand letter triggered U.S. Fire's duty to defend during the period of time after U.S. Fire received the private demand but before it received the public claim.  See Electronic Order (Gertner, J., June 19, 2009).  No issue on the duty to defend the private demand has surfaced on appeal.

[4] The 2007 summary judgment record is robust and includes communications among the various players from 2004 through 2007 as explained by, inter alia, the deposition testimony of the third-party claims administrators for both U.S. Fire and ACE.  The material facts regarding U.S. Fire's breach involve the interactions between the Museum and U.S. Fire, including their agents.

Gray but failed to pay even a partial payment despite repeated requests for some measure of payment. For example, in 2005, the Museum sent U.S. Fire the billing invoices from both Ropes & Gray and ENSR and, soon after, provided further detail for the ENSR bills.[5] Still, no money came. Then, U.S. Fire remained silent when directly asked in an August 2005 email whether it had paid any defense costs to date. According to the record, about a year passed before U.S. Fire informed the Museum that it was unable to confirm whether it had ever received any billing for defense costs.

The Museum filed suit against U.S. Fire in June 2006 and again sent copies of the Ropes & Gray bills to the insurer. The Museum also sent U.S. Fire additional legal bills at the end of 2006. Yet, another six months passed before U.S. Fire informed the Museum, in June 2007, that it had lost the billing information and asked for additional copies. The Museum promptly complied. After another three-month lapse without any payment in hand, the Museum filed a motion for summary judgment to enforce U.S. Fire's defense obligation. Finally, in conjunction with its objection, U.S. Fire sent its first payment to the Museum totaling $611.41. This amount represented what U.S. Fire considered to be a fair portion of the Ropes & Gray bills for the public claim: it

---

[5] The legal bills related to work for both the private demand and the public claim but some invoices clearly identified the public claim work.

unilaterally reduced the charged attorney's fees rate to $200 per hour, and further reduced to 40%[6] the revised total legal bills. No payment was offered for any of the 2004 ENSR bills which totaled roughly $70,000.00 at that time.[7]

U.S. Fire's persistent failure to make any payment toward defense costs despite having nominally accepted that duty may be treated as a wrongful refusal to defend upon receipt of notice of a claim.  The SJC has said explicitly that "[a]n insurer which reserves its rights and takes no action in defense of its insured, when it knew, or should have known, of a covered claim, or which fails to investigate diligently, despite repeated claims of coverage and requests for a defense from an insured facing demands for immediate action, could be found to have committed a breach of the duty to its insured."  Sarnafil, Inc. v. Peerless Ins. Co., 636 N.E.2d 247, 253 (Mass. 1994); accord Chi. Title Ins. Co. v. Fed. Deposit Ins. Corp., 172 F.3d 601, 604-06 (8th Cir. 1999) (holding that the insurer's failure to pay even what it had

---

[6] U.S. Fire and ACE purportedly agreed to a 40/60 split of the defense cost bills for the public claim.  ACE had agreed to defend both the private demand and the public claim.  In any event, the apportionment agreed to by the insurers was not binding on the insured.

[7] The precise dollar figure for the ENSR billings on the public claim that were provided to U.S. Fire in 2005 is unclear in the record.  Still, the tens of thousands of dollars for the site work that ENSR largely conducted in 2004 was in excess of $66,000.00 but less than $85,000.00.  As explained, U.S. Fire's breach does not depend on the exact calculation.

considered to be a reasonable sum for defense costs, despite having nominally accepted the tender of defense, constitutes a breach of the duty to defend).

None of the factual issues identified by U.S. Fire are material to the breach question here. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). First, it is immaterial that the individual employee who was managing the public claim does not recall ever having personally received the packet. U.S. Fire does not contest the validity of the Federal Express receipt signed by an employee of its third-party claims administrator and dated April 11, 2005, which indisputably shows that the 2005 billing packet was actually received by U.S. Fire's agent. See Bockser v. Dorchester Mut. Fire Ins. Co., 99 N.E.2d 640, 642 (Mass. 1951) (noting that a principal is generally bound by the actions of its agents); Chow v. Merrimack Mut. Fire Ins. Co., 987 N.E.2d 1275, 1279-80 (Mass. App. Ct. 2013) (same). Moreover, other undisputed documents show that the same individual claims adjuster did receive follow-up information about the ENSR bills that the Museum had sent that same summer. In short, any failure on the part of the company serving as U.S. Fire's third-party administrator for the public claim does not bear on the legal dispute between the insurer and its insured. Cf. Palermo v. Fireman's Fund Ins. Co., 676 N.E.2d 1158, 1163 (Mass. App. Ct.

- 11 -

1997) (emphasizing that proof of good faith has no relevance to the Polaroid burden-shifting rule).

The reasonableness of the Ropes & Gray hourly rate also is immaterial. It is U.S. Fire's prolonged failure to pay any portion of its acknowledged responsibility that gives rise to the breach here. See, e.g., Chi. Title Ins. Co., 172 F.3d at 604-06. Thus, any quibbling about the hourly rate simply relates to damages that are owed to the Museum.

U.S. Fire's plaint about the divisibility of the ENSR bills between defense and indemnity costs is similarly immaterial. U.S. Fire tacitly acknowledged in its 2007 papers (and also before us now) that some portion of the ENSR bills relating to the 2004 site work constitutes recoverable defense costs.[8] Yet, as with the legal fees, U.S. Fire made no attempt to pay a single cent, nor is there any record evidence that it made any effort to resolve the sizable remuneration issue.

U.S. Fire's apathy stands in sharp contrast to the Museum's multiple requests for some measure of contractual defense benefits in 2004 and 2005; its request for clarification in August 2005 of what "defense expenditures [its insurer may have paid] to

---

[8] Appropriately so. See, e.g., Chemical Leaman Tank Lines, Inc. v. Aetna Cas. & Sur. Co., 117 F.3d 210, 223-24, 225 n.20 (3d Cir. 1999); Endicott Johnson Corp. v. Liberty Mut. Ins. Co., 928 F. Supp. 176, 183-84 (N.D. N.Y. 1996); Siltronic Corp. v. Emp'rs Ins. Co. of Wasau, No. 3:11-CV-1493-ST, 2104 WL 901161, at *7 (D. Or. Mar. 7, 2014).

date [and] on what terms"; and its express reminder about the ENSR bills in its November 2006 correspondence.  Cf. Vt. Mut. Ins. Co. v. Maguire, 662 F.3d 51, 56-58 (1st Cir. 2011) (holding as a matter of law that the insurer's diligent investigation efforts and readiness to comply negated allegations of breach, especially when compared to the insured's lackadaisical conduct).

We also reject U.S. Fire's attempt to transform its acknowledged duty to defend into a duty only to reimburse reasonable fees and costs.  According to U.S. Fire, as soon as the Museum opted to retain control of its own defense for the public claim, the insurer no longer had a duty to defend and thus its subsequent conduct cannot amount to a defense breach triggering Polaroid's burden-shifting rule.  But this newly minted theory was not presented to the district court and, so, it "cannot be surfaced for the first time on appeal."  Goldman v. First Nat'l Bank of Bos., 985 F.2d 1113, 1116-17 n.3 (1st Cir. 1993) (internal citation and quotation marks omitted).

In any event, the state cases that U.S Fire cites in support of its transformation theory address only how an insurance company satisfies its duty to defend after the insured opts to maintain the defense due to the insurance company's reservation of rights.  See, e.g., Herbert A. Sullivan, Inc. v. Utica Mut. Ins. Co., 788 N.E.2d 522, 528 (Mass. 2003); N. Sec. Ins. Co. v. R.H. Realty Trust, 941 N.E.2d 688, 691 (Mass. App. Ct. 2011); Watts

- 13 -

Water Techs., Inc. v. Fireman's Fund Ins. Co., 22 Mass. L. Rptr. 659, 2007 WL 2083769, at *6, *9-10 (Mass. Super. Ct. 2007). While it is true that an insurance company's obligation to pay defense costs may in some circumstances stem from its contractual duty to indemnify, rather than its duty to defend, any contractual framework to that effect is dictated by the mutually agreed upon language in the policy or other comparable evidence. See, e.g., Liberty Mut. Ins. Co. v. Pella Corp., 650 F.3d 1161, 1168-71 (8th Cir. 2011); Stonewall Ins. Co. v. Asbestos Claims Mgmt. Corp., 73 F.3d 1178, 1218-19 (2d Cir. 1995); Shapiro v. Am. Home Assurance Co., 616 F. Supp. 906, 910-11 (D. Mass. 1985); Health Net, Inc. v. RLI Ins. Co., 141 Cal.Rptr.3d 649, 660, 670-71 (Cal. App. 2012). The record does not suggest this to be the nature of the agreement between the parties here.[9] Moreover, the summary judgment record contains numerous internal documents authored by U.S. Fire and evidence of its communications with others plainly showing that it understood the defense costs question to be tethered to its contractual duty to defend the public claim, even after the Museum chose to remain with Ropes & Gray. On the whole, U.S. Fire's

---

[9] The policy provides that U.S. Fire "shall have the right and duty to defend any suit against the insured seeking damages on account of such . . . property damage, even if any of the allegations of the suit are groundless, false or fraudulent, . . . but the company shall not be obligated . . . to defend any suit after the applicable limit of the company's liability has been exhausted by payment of judgments or settlements."

- 14 -

silence below on this transformation argument forecloses further indulgence.

Lastly, U.S. Fire argues that application of the Polaroid burden-shifting rule is foreclosed here by the lack of evidence that the Museum suffered any prejudice due to the delay in U.S. Fire's payment of the de minimis defense costs owed as of October 2007. The SJC's Polaroid holding does not require proof of prejudice, however. In adopting a new bright-line rule regulating the burden of proof where a defense default has occurred, the SJC examined the natural consequences that ordinarily flow from such a breach. For example, the state court explained that a delay in honoring defense obligations may cause an insured to accept greater liability due to a lack of financial resources to defend itself, or that delay may hinder the insured's ability to later prove coverage. Polaroid Corp., 610 N.E.2d at 922. The SJC did not then search for evidence of actual prejudice in order to discern whether the new burden-shifting rule applied to the case before it. Id. Indeed, it appears that the insured in that case may very well have had the financial wherewithal to pay for its own defense. See id. (remarking that the insured had "the benefit of controlling the defense").

To cinch the matter, later Massachusetts cases provide no indication that application of the Polaroid rule first requires a showing of prejudice. See, e.g., Highlands Ins. Co. v. Aerovox

- 15 -

Inc., 676 N.E.2d 801, 804 n.6 (Mass. 1997); Liquor Liab. Joint Underwriting Ass'n v. Hermitage Ins. Co., 644 N.E.2d 964, 968, 969 & n.6 (Mass. 1995); Utica Mut. Ins. Co. v. Fontneau, 875 N.E.2d 508, 513 (Mass. App. Ct. 2007); Swift v. Fitchburg Mut. Ins. Co., 700 N.E.2d 288, 293-94 (Mass. App. Ct. 1998); Palermo, 676 N.E.2d at 1163.

A cautionary tale to be sure. The full amount of the Ropes & Gray bills that were pending in October 2007 for the public claim was fairly modest. However, the dollar amounts of the ENSR bills -- mostly left ignored by U.S. Fire in its advocacy -- numbered in the tens of thousands as of January 2005. Even still, U.S. Fire's breach of its duty to defend does not rest on calculations, but on its wholesale apathy towards its contractual defense obligation that it owed to its insured -- and that it had affirmatively accepted as of March 2004.

Given the undisputed facts, the district court properly faulted U.S. Fire as a matter of law for breaching its duty to defend. Accordingly, we uphold the court's 2007 decision on defense breach and, thus, the insurance company must swallow Polaroid's bitter pill.

### III.

The principal parties next appeal discrete aspects of the district court's allocation decision, which is woven out of portions of the court's September 2010 and August 2011 orders.

See Peabody Essex Museum, Inc. v. U.S. Fire Ins. Co., No. 06CV11209-NG, 2010 WL 3895172 (D. Mass. Sept. 30, 2010) (Gertner, J.); id., 2011 WL 3759728 (D. Mass. Aug. 24, 2011) (Gertner, J.). Under attack are the court's rulings that: (i) the pro rata allocation rule under Boston Gas applied in this case; (ii) the appropriate start date for the allocation period was the first day of U.S. Fire's 1983-1985 policy period, i.e., December 19, 1983; (iii) the fact-based approach, rather than time-on-the-risk, governed the allocation calculus; and (iv) defense costs were not subject to pro rata allocation.[10]  We review de novo the district court's interpretation and application of state law, and for abuse of discretion the court's understanding of the jury's verdict and selection of allocation method.  See Salve Regina Coll. v. Russell, 499 U.S. 225, 231-234 (1991); Boston Gas Co. v. Century Indem. Co., 708 F.3d 254, 259-66 (1st Cir. 2013).

The proceedings following the court's 2007 order on defense obligations included a 2008 pre-trial summary judgment order resolving certain indemnity issues, a 2009 jury trial establishing indemnity liability, and then, the 2010 and 2011 post-trial summary judgment orders resolving the allocation of indemnity as between U.S. Fire and the Museum's self-insured

---

[10] One of the many legal rulings that neither party appeals is the district court's conclusion that language in the U.S. Fire policy is most consistent with an injury-in-fact trigger.  See Peabody Essex Museum, 2010 WL 3895172, at *11-12.

- 17 -

portion.  We note four aspects of these proceedings that help inform the analysis.

First, the competing evidence.  An estimated release of ten thousand gallons[11] caused a significant subsurface oil plume, a portion of which polluted the Heritage Plaza property.  The Museum's expert blamed the underground storage tanks or associated piping on the Museum's property that, he asserted, may have begun releasing oil no later than 1979.  By contrast, U.S. Fire's expert tied the pollution to a compromised fuel line that was damaged on the Museum's property during reconstruction activities in 1987, more than one year after the conclusion of the 1983-1985 policy period.

Second, the indemnity rulings and findings.  The district court ruled in March 2009 that because of the "scant evidence" on how the oil release occurred, U.S. Fire could not prove, pursuant to its burden under Polaroid, that any oil release from the underground storage tanks or piping was not sudden; "[t]here is simply no evidence on this issue, either way."  Peabody Essex Museum, Inc., 623 F. Supp. 2d at 106-11 (noting that the parties did not dispute whether the oil release was accidental). Then, with respect to the timing of the contamination, in June 2009 a jury found that U.S. Fire had not proven that the pollution

---

[11] While the record is not entirely consistent, the parties eventually seemed to settle on this estimated calculation.

- 18 -

first began after the policy period.  This finding triggered indemnity.  The jury also found that U.S. Fire further failed to prove any date on which the pollution had first begun.[12]

Third, the Boston Gas decision.  As noted earlier, the SJC issued its decision in Boston Gas about one month after the 2009 indemnity trial in this case but before the district court had resolved allocation questions.  Boston Gas rejected the joint and several liability approach for indemnity in progressive pollution cases, instead adopting a pro rata allocation rule that applies even for pollution years in which the property owner is self-insured. 910 N.E.2d at 299-311, 315-16 (holding depends on the policy language at hand).  The SJC further held that, while a fact-based method of allocation is "ideal," time-on-the-risk serves as a default approach absent sufficient evidence that may allow for a more accurate estimation of the quantum of property damage during the risk period.  Id. at 312-16.

---

[12] Explication of trigger and allocation of indemnity in Massachusetts is provided in Boston Gas Co., 910 N.E.2d at 300-01.  Of note, proration in progressive injury cases requires setting a start and end date for the pollution in order to devise an allocation period.  See, e.g., Peabody Essex Museum, 2010 WL 3895172, at *6-12.  In this case, knowing that certified questions were pending before Boston Gas, the district court required counsel to submit proposed jury instructions for addressing allocation issues in order to aid the post-trial resolution of the scope of indemnity.  Neither party appeals the court's denial of the joint request for bifurcation.

Fourth, the post-trial procedural posture. Whittled down, the parties' pleadings show that they ultimately agreed that the district court could decide the Boston Gas allocation issues without the aid of a second jury trial.

With this grounding, we turn to the appellate arguments.

**A.**

The Museum contends that U.S. Fire's failure to prove when the pollution first began forecloses the insurer from relying on Boston Gas to prorate the indemnity costs that it owes to its insured. Essentially, the Museum advocates for a joint and several liability approach in this case. We conclude, however, that the district court properly presaged the SJC's approach when it declined to adopt the insured-friendly position urged by the Museum. See Boston Gas, 708 F.3d at 264 (explaining federal court's duty to "make an informed prediction" as to state court's probable decision if it faced the state law question).

No doubt the allocation issue is complicated in this case by the absence of a factual finding from the jury that marks a definite start date. But a dearth of evidence is no anomaly where long-term pollution has gone undetected for decades. Even so, as the district court explained, limited evidence on the timing of known pollution in a given case may display a range of possible allocation periods, any of which would result in less than 100% indemnity from a particular insurer. In such circumstances, the

principles of Polaroid and Boston Gas would not countenance full indemnity based on failure of proof alone.

In both Polaroid and Boston Gas, the SJC rejected proposed legal rules that would have enabled insureds to receive windfall judgments that extended indemnity beyond the contractual limits set forth in the operative policies. See Boston Gas, 910 N.E.2d at 299-312 (rejecting joint and several allocation for progressive pollution cases as incongruous with both the policy language and important public policy objectives); Polaroid Corp., 610 N.E.2d at 920-22 (declining to automatically impose full indemnity liability for a breach of the duty to defend as incongruous with both the policy language and important public policy objectives). Instead, the SJC has opted for a balanced approach that affords indemnity coverage only up to the extent secured by the policy contract between the parties, even where factual circumstances may muddy the evidentiary waters. See, e.g., Boston Gas, 910 N.E.2d at 293, 301, 312, 314, 317 (noting absence of evidence for proving timing of property damage in progressive pollution cases, while still endorsing a fact-based calculus where plausible).

Accordingly, we hold that the district court correctly ruled that Boston Gas applies to this case such that the "start and end dates [must be] construed against the party with the burden of proof, so long as they are consistent with the jury's verdict"

and the trial record.  Peabody Essex Museum, 2010 WL 3895172, at *7.  This approach comports with Polaroid by holding U.S. Fire responsible for the problems of proof that were presumptively caused by its breach of the duty to defend.  See Polaroid Corp., 610 N.E.2d at 922.

**B.**

With that understanding of Polaroid and Boston Gas, we turn to the district court's selection of the beginning of the 1983-1985 policy period as the start date for the allocation period.  U.S. Fire contends that the court misconstrued the jury's findings and that 1979 should be the start date in order to align with the testimony of the Museum's expert and trial concessions.  We are unpersuaded that there was any reversible error.

The verdict form that was presented to the jury posed three questions that addressed the timing of the pollution for purposes of both triggering coverage and marking a start date for an allocation period.  Question 1 essentially asked whether U.S. Fire had proven its factual theory that the 1987 oil spill was the source of the pollution, rather than the older underground storage tanks or pipelines.  Question 2 asked whether U.S. Fire had proven the date on which the release of oil first caused property damage, to be answered only if the jury disbelieved U.S. Fire's theory about the 1987 spill.  Question 3 then asked the jury to select a proven beginning date from a list of ranges in the event that it

- 22 -

answered Question 2 affirmatively.  The jury answered the first two questions in the negative and did not answer the third.

In light of the trial template, the district court discerned that these jury findings, particularly in answer to Question 2, meant either that the jurors had accepted the Museum's expert evidence on the source and timing of the pollution relating to the older underground storage tanks, or that the jury had discredited the evidence presented by both parties.  After all, pursuant to Polaroid, the Museum only bore the burden of producing credible evidence to trigger indemnity; it had no burden to proffer any evidence of a definitive start date for the oil release(s), much less to prove it.  And, so, to determine a start date from this verdict ambiguity, the district court returned to the Polaroid burden-shifting rule: given U.S. Fire's failure of proof, the court "construe[d] the jury's findings to mean that the allocation period begins on the first day of U.S. Fire's policy" as "the least favorable date for an insurer that could not meet its burden of proof" while still remaining "broadly consistent with the jury's verdict."  Peabody Essex Museum, 2010 WL 3895172, at *8.

U.S. Fire protests this construction.  According to U.S. Fire, "the jury was never asked to determine the start date."  U.S. Fire reasons that because it "never attempted to prove a release prior to December 19, 1985," it necessarily could not have proven by a preponderance of the evidence the date on which the release

- 23 -

of fuel oil first caused property damage.  Thus, it says, the jury's negative answer to Question 1 (rejecting the 1987 spill theory) <u>automatically</u> required a negative answer to Question 2 (a lack of a start date), without any further deliberation.  This position, however, is out of step with the language of the verdict form, the jury instructions, and the context of the litigation.

The verdict form plainly prompted the jury to decide Question 2 <u>only</u> if it answered the first question in the negative, a point that the court included in its instructions to the jury.[13] The court also instructed the jurors to answer "no" to Question 2 if they found the evidence was "insufficient to make a decision one way or the other" or could not "figure out the date" of a pre-December 1983 oil release.

Moreover, the district court had abundantly forewarned the parties that the indemnity trial likely would serve as staging for potential allocation issues given the pending status of <u>Boston Gas</u> pre-trial.  The court requested, and received, proposed

---

[13] Beginning after Question 1, the pertinent part of the verdict form provides:

> **If your answer is "Yes," there is no coverage and you should not go on.**
>
> 2. If you answered "No" to Question 1, has U.S. Fire proven, by a preponderance of the evidence, the date on which the release of fuel oil first caused property damage?

(Bolded format is in the original.)

allocation instructions from the parties.  And colloquies with counsel during trial show that U.S. Fire expressly assented to a start date question tethered to the underground oil tanks as the possible pollution source, in order to avoid a potential second trial for allocation.

In short, U.S. Fire's self-chosen trial strategy of focusing the jury's attention on the 1987 event in order to avoid indemnity does not alter the trial realities that the start date question was directly posed to and answered by the jury, with U.S. Fire bearing the burden of proof.[14]

We also reject U.S. Fire's contention that the district court erred in failing to select 1979 as the start date in keeping with the Museum's expert's testimony.  As noted, the Museum was not required to prove any definitive start date at all.  Nor did the Museum's counsel concede that a negative answer to Question 1 meant that the jury necessarily found that the pollution began no later than 1979.  Indeed, the Museum's summation at the close of trial expressly belies U.S. Fire's current supposition.  To the extent that U.S. Fire relies on principles of equity to advance a 1979 start date, it provides no basis for holding that the district

---

[14] U.S. Fire did not object to the jury instructions, nor to the format of the verdict form in relation to the start date question.  See Palermo, 676 N.E.2d at 1162 n.7, 1163.  Thus, U.S. Fire's opportunity for challenging the framing of the verdict form as "improperly drafted" has long since passed.

court abused its discretion in rejecting this position. See Boston Gas, 708 F.3d at 259-64.

In the end, we acknowledge as anyone must that the December 19, 1983 start date has a make believe quality. Lean evidence has been the nemesis of this case from the inception of the litigation. But the district court did not abuse its discretion, on this record, in construing the jury's findings in a manner that maximizes U.S. Fire's indemnity exposure in line with its burden under Polaroid.

## C.

U.S. Fire next argues that the district court erred in opting to apply a fact-based method for allocation rather than the default time-on-the-risk method. In so deciding, the court adopted the Museum's post-trial revised expert report which projected that 9,000 square feet of soil damage occurred during the two-year policy period. See Peabody Essex Museum, 2011 WL 3759728, at *1. This calculation relied on the assumption that the 10,000-gallon oil release began on December 19, 1983, the start date selected by the court, and definitively ceased in June 1986 when the oil tanks were removed from the ground.[15]

U.S. Fire contends that the revised report cannot support a fact-based allocation because the December 19, 1983 start

---

[15] The parties agreed that oil migration continued to cause property damage after the tanks were removed from the ground.

date is purely fictional. It also faults the district court for considering U.S. Fire's indemnity burden under Polaroid when assessing whether the report's estimation of the spread of oil warranted a fact-based approach. Again, we are not persuaded of any reversible error.[16]

In deciding Boston Gas, the SJC granted trial courts considerable leeway in selecting between time-on-the-risk and fact-based allocation in progressive pollution cases. Boston Gas, 910 N.E.2d at 316. Courts face this choice in complex cases in which the factual events are already thickly clouded by evidentiary uncertainty, see id. at 300-02, 305; the ultimate decision requires a careful review of the intricacies of the case as well as equitable considerations, see id. at 316; see also New Eng. Insulation Co. v. Liberty Mut. Ins. Co., 988 N.E.2d 450, 454 (Mass. App. Ct. 2013). The SJC emphasized that it favors a fact-based approach as more reflective of the parties' contractual obligations, explaining that this method should be applied where the record contains "evidence more closely approximating the actual distribution of property damage" than time-on-the-risk calculations. Boston Gas, 910 N.E.2d at 293. Thus, fact-based allocation should apply when "a more accurate estimation" of the

---

[16] While the district court relied on two expert reports proffered by the Museum, U.S. Fire's appeal relates only to the report that we discuss.

quantum of property damage that took place during the triggered policy years is "feasible." Id. at 314, 316.

As we have noted, mooring the start of the property damage to the commencement of the policy period on December 19, 1983 indeed bears a fictional quality. The revised report, however, adopted that start date as previously determined by the district court in its 2010 order, which was generally based on the evidence and on the jury's findings. Although the Polaroid burden-shifting rule also influenced the start date finding, that date is no less a factual finding under the circumstances of this case. No more is required under Boston Gas. Cf. Boston Gas, 708 F.3d at 259, 260 (holding that the trial court's decision to apply time-on-the-risk was "reasonable" because the record would not allow a factfinder to specify damages "in time and degree with any level of certainty" (emphasis added)).

Neither did the district court err in considering U.S. Fire's burden under Polaroid when evaluating the estimation of the spread of the oil plume. The court faced the allocation method question in a case not only rife with the normal problems of proof in progressive pollution cases, see Boston Gas, 910 N.E.2d at 316, but also couched in an atypical legal setting in which the insurance company had controlled the evidentiary template during

the indemnity trial.[17]  In short, we cannot say that it was error

for the district court to hew to the Polaroid rule, which compels

insurance companies to shoulder the indemnity share that is

associated with proof problems when that company defaulted on its

duty to defend.

In the final analysis, the district court judge -- who

had presided over the entirety of the litigation through the August

2011 order -- confronted two somewhat unsatisfactory factual

situations in selecting the appropriate allocation method.[18]  After

a careful scrutiny of the complexities, we see no sound reason for

disturbing the court's discretionary decision that fact-based

allocation aligned closer to the evidence and the equities in this

case.[19]

---

[17] Tellingly, U.S. Fire remained silent in the face of the Museum's post-trial accusation that the insurer had never pursued any discovery on the duration of contamination respecting the underground oil tanks.

[18] Two district court judges presided over the lengthy litigation.  Judge Gertner resolved the bulk of the merits while presiding from 2006 through August 2011, and Judge Gorton resolved the tail-end of the matter such as the inevitable motions for reconsideration, modification of judgment, attorney's fees, and prejudgment interest.

[19] U.S. Fire's assorted complaints about the district court's "silence" respecting the revised report's "series of assumptions" ring hollow.  Its assertions fail to account for the court's implicit adoption of the Museum's responsive pleadings and exhibits, recapitulate the "artificial" start date argument, and otherwise ignore the trial testimony including that of its own expert.

**D.**

As a final allocation matter, U.S. Fire contends that the district court erred in ruling that defense costs for the public claim are not subject to time-on-the-risk proration under Boston Gas. U.S. Fire acknowledges that the SJC did not reach the question of whether or how defense costs should be prorated, and its argument on appeal is not robust. See Powell v. Tompkins, 783 F.3d 332, 348-49 (1st Cir. 2015) (explaining appellate waiver). We go only so far as the argument takes us, which is not far enough to divvy up defense costs here.

U.S. Fire briefly offers two "significant indicators" from Boston Gas to support its pitch that defense costs should be prorated: the SJC's citation to case law that applies time-on-the-risk proration to both defense costs and indemnity,[20] and the SJC's decision to apply proration principles to self-insured retentions which, U.S. Fire points out, generally include defense and indemnity. These supposed indicators, however, appear diminutive

---

[20] U.S. Fire identifies just one case cited in Boston Gas, which is readily distinguishable from the circumstances at hand. In Insurance Company of North America v. Forty-Eight Insulations, Inc., the Sixth Circuit prorated defense costs to avoid a troublesome scenario in which the insured manufacturer, "which had insurance coverage for only one year out of 20[,] would be entitled to a complete defense of [about 1,300 different] asbestos actions the same as a manufacturer which had coverage for 20 years out of 20." 633 F.2d 1212, 1225 (6th Cir. 1980); cf. GMAC Mortg., LLC, 985 N.E.2d at 827 (noting that the complete defense rule typically applies for claims asserted in the same lawsuit).

next to long-standing state precedent on the broad and formidable contractual duty to defend that heavily favors insureds and that stands apart from indemnity obligations. See, e.g., GMAC Mortg., LLC v. First Am. Title Ins. Co., 985 N.E.2d 823, 827 (Mass. 2013); Doe v. Liberty Mut. Ins. Co., 667 N.E.2d 1149, 1151 (Mass. 1996); see also Dryden Oil Co. of New England, Inc. v. Travelers Indem. Co., 91 F.3d 278, 282 (1st Cir. 1996) (noting that under Massachusetts law, "[t]he duty to indemnify is defined less generously [than the duty to defend] as it depends on the evidence, rather than an expansive view of the complaint" (internal citation omitted)). And duty to defend protection is all-encompassing. See GMAC Mortg., LLC, 985 N.E.2d at 827 (explaining the "in for one, in for all" or "complete defense" rule that applies to insurers in the general liability insurance context); Deutsche Bank Nat'l Ass'n v. First Am. Title Ins. Co., 991 N.E.2d 638, 641-42, n.10 (Mass. 2013); see also Liberty Mut. Ins. Co. v. Met. Life Ins. Co., 260 F.3d 54, 63-64 (1st Cir. 2001) (reviewing Massachusetts law on allocation of defense costs generally); Chi. Bridge & Iron Co. v. Certain Underwriters at Lloyd's, London, 797 N.E.2d 434, 444-45 (Mass. App. Ct. 2003) (refusing to allocate defense costs where the litigation relating to contamination sites covered under the policy also resolved liability questions for sites that were not).

- 31 -

Even narrowing our view to Boston Gas itself, we observe that the SJC carefully circumscribed its decision to the indemnity allocation questions that were before it. See, e.g., 910 N.E.2d at 301, 311 n.38.[21] And, in its allocation analysis -- including the self-insured retention discussion -- the state court placed significant weight on the specific language embodied in the indemnity provisions of the policy before it. Id. at 304-09, 315-16.

In short, we decline U.S. Fire's invitation to extend the Boston Gas allocation holding to defense costs in this case, particularly where the insurance company has made no attempt to address its own policy language on the duty to defend. Cf. id. at 306 n.33 (referring to cited policy language that expressly provided for proration of defense costs). After all, U.S. Fire pursued removal of this case from state court to federal court, and "[w]e have warned, time and again, that litigants who reject a state forum in [favor of] federal court under diversity jurisdiction cannot expect that new state-law trails will be blazed" by the federal court. Carlton v. Worcester Ins. Co., 923

---

[21] We are aware that at least one district court decision appears to have interpreted Boston Gas as endorsing allocation of defense costs. See Graphic Arts Mut. Ins. Co. v. D.N. Lukens, Inc., No. 11-CV-10460, 2013 WL 2384333, at *7 (D. Mass. May 29, 2013) (Hillman, J.). That decision does not, however, address the robust, contrary state law precedent on the contractual duty to defend. And U.S. Fire does not rely on Graphic Arts for this argument.

F.2d 1, 3 (1st Cir. 1991) (internal quotation marks and brackets omitted).

Accordingly, we affirm the district court's September 2010 and August 2011 allocation rulings that the parties have challenged on appeal.

**IV.**

U.S. Fire appeals the district court's Chapter 93A ruling that it knowingly and willfully failed to effect a fair settlement for the unreimbursed defense costs after the court issued the 2007 order on its defense default. See Peabody Essex Museum, Inc., 2011 WL 3759728, at *2; see also Mass. Gen. Laws ch. 93A, §§ 2, 11. The court's ruling was grounded in the business-to-business provision under Chapter 93A, § 11, as the Museum had pitched its claim. After reviewing the litigation record[22] and governing state law, we conclude that reversal is required because the court's decision rests on a legal error and the record does not, as a matter of law, support a finding of unfair settlement conduct actionable under Chapter 93A. See Fed. Ins. Co. v. HPSC, Inc., 480 F.3d 26, 34 (1st Cir. 2007); Ahern v. Scholz, 85 F.3d 774, 797 (1st Cir. 1996).

---

[22] We have considered the materials that both parties provided to the district court, mindful that U.S. Fire does not press before us the evidentiary objection about the settlement documents that was raised below.

- 33 -

Chapter 93A precludes "unfair or deceptive acts or practices in the conduct of trade or commerce" and penalizes "willful or knowing" violations with awards of multiple damages. Mass. Gen. Laws ch. 93A, §§ 2, 9, 11; see Barron Chiropractic & Rehab. v. Norfolk & Dedham Grp., 17 N.E.3d 1056, 1065-66 (Mass. 2014) (describing pertinent factors). To be actionable, the challenged misconduct must rise to the level of an "extreme or egregious" business wrong, "commercial extortion," or similar level of "rascality" that raises "an eyebrow of someone inured to the rough and tumble of the world of commerce." Baker v. Goldman Sachs & Co., 771 F.3d 37, 49-51 (1st Cir. 2014); Zabin v. Picciotto, 896 N.E.2d 937, 963 (Mass. App. Ct. 2008). The core inquiry focuses on "the nature of challenged conduct and on the purpose and effect of that conduct." Mass. Emp'rs Ins. Exch. v. Propac-Mass, Inc., 648 N.E.2d 435, 438 (Mass. 1995).

In the insurance context, business misconduct that is actionable under Chapter 93A may include unfair settlement practices that are defined under Chapter 176D, § 3. Hallmarks of such misconduct generally involve the "absence of good faith and the presence of extortionate tactics." Guity v. Commerce Ins. Co., 631 N.E.2d 75, 77-78 (Mass. App. Ct. 1994). Such circumstances include withholding payment from the insured and "stringing out the process" by using shifting, specious defenses with the intent to force the insured into an unfavorable

- 34 -

settlement.  Commercial Union Ins. Co. v. Seven Provinces Ins. Co., 217 F.3d 33, 40 (1st Cir. 2000) (providing examples under Massachusetts law).  By contrast, neither a good faith dispute over billing, nor the mere failure to settle a claim when another reasonably prudent insurer would have done so, establishes Chapter 93A liability.  See id. at 43; see generally Hartford Cas. Ins. Co. v. N.H. Ins. Co., 628 N.E.2d 14, 17-18 (Mass. 1994).

Rather than apply these Chapter 93A standards, the district court solely relied on an unfair settlement practice provision under Chapter 176D as the litmus test for finding Chapter 93A, § 11 business-to-business liability.  See Mass. Gen. Laws ch. 176D, § 3(9)(f) (proscribing the failure "to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear").  However, unlike consumer claims under Chapter 93A, § 9, a violation of Chapter 176D constitutes only probative evidence, not per se proof, of egregious business misconduct for a Chapter 93A, § 11 business-to-business claim.  See Polaroid Corp., 610 N.E.2d at 917; Transamerica Ins. Grp. v. Turner Constr. Co., 601 N.E.2d 473, 477 (Mass. App. Ct. 1992).  The district court did not recognize this well-established legal distinction under state law.  See Mass. Gen. Laws ch. 93A, § 9(1); see also Hopkins v. Liberty Mut. Ins. Co., 750 N.E.2d 943, 950 n.12 (Mass. 2001) (explaining 1979 amendment to Ch. 93A, § 9

consumer-to-business claims). Accordingly, its ruling on Chapter 93A, § 11 liability contains a legal error.

Moreover, the record does not display the type of egregious settlement malfeasance that may be actionable under Chapter 93A, § 11. The district court targeted, albeit through the Chapter 176D lens, two aspects of U.S. Fire's conduct: its fractional payment as of June 2009 (about $9,000) of significant defense costs then-incurred by the Museum and its subsequent failure to reach a fair settlement on the remaining amount, forcing the Museum to continue to litigate defense costs. The district court's view of the record, however, is too constricted.

In fact, U.S. Fire immediately pursued mediation for defense costs after the court's December 2007 decision, which had left open pertinent surrounding issues.[23] But the Museum resisted, desirous of a global settlement despite the fact that no expert evidence on the indemnity issues had yet been procured at that point. After discovery, the parties participated in two significant efforts for formal mediation throughout 2009, and U.S. Fire continued taking active steps to resolve the defense costs issue in the midst of a variety of entangled disputes. See Premier

---

[23] The open defense costs issues included, for example, the reasonableness of the hourly rate charged by Ropes & Gray, the relationship between the public claim and the Heritage Plaza private demand, and the division between defense costs and indemnity respecting ENSR's then-completed work.

Ins. Co. of Mass. v. Furtado, 703 N.E.2d 208, 210 (Mass. 1998); Duclersaint v. Fed. Nat'l Mortg. Ass'n, 696 N.E.2d 536, 540 (Mass. 1998).  On the whole, the unreimbursed defense costs issue was shuffled into the broader panoramic of on-going, complex litigation which included the potential legal responsibility of the Museum's other insurers.  See Cullen Enters., Inc. v. Mass. Prop. Ins. Underwriting Ass'n, 507 N.E.2d 717, 723 (Mass. 1987); Waste Mgmt. of Mass., Inc. v. Carver, 642 N.E.2d 1058, 1061 (Mass. App. Ct. 1994).

There is simply no evidence that the delay in paying unreimbursed defense costs was attributable to nefarious leveraging conduct or motives on U.S. Fire's part. See Boston Symphony Orchestra, Inc. v. Commercial Union Ins. Co., 545 N.E.2d 1156, 1160 (Mass. 1989); cf. N. Sec. Ins. Co., 941 N.E.2d at 692. In fact, at one point, when U.S. Fire challenged the Museum's calculation of interest for unreimbursed defense costs in 2009, the Museum averred "futility [in] submitting further bills" given U.S. Fire's oversight, years earlier, with respect to the first billing packet that the Museum had sent in 2005.  When efforts toward global settlement ultimately failed, U.S. Fire offered the Museum a significant sum to settle the unreimbursed defense costs and associated issues, which apparently went unanswered.  Then, in June 2011, the Museum spotlighted -- for the first time -- U.S.

Fire's post-2007 settlement conduct as the primary impetus for Chapter 93A, § 11 liability and punitive damages.

U.S. Fire's conduct under these circumstances is not the kind that the SJC has condemned as egregious settlement misconduct that is actionable under Chapter 93A. Cf. R.W. Granger & Sons, Inc. v. J & S Insulation, Inc., 754 N.E.2d 668, 678-79 (Mass. 2001) (holding that the surety's conduct of unexplained delay, hollow settlement effort, and groundless legal stance comprised culpable unfair business conduct under Chapter 93A).

By no means do we endorse some of the gamesmanship that laces the protracted litigation. But the Museum's own posturing is not unimportant to the Chapter 93A inquiry. See Parker v. D'Avolio, 664 N.E.2d 858, 864 n.9 (Mass. App. Ct. 1996) (emphasizing in the Chapter 93A context that good faith is a reciprocal responsibility between an insurer and an insured); see also Ahern, 85 F.3d at 798 (noting that the Chapter 93A calculus considers "the equities between the parties, including what both parties knew or should have known").

Even if some measure of U.S. Fire's conduct may have been ill-advised, and perhaps even violative of Chapter 176D, we hold that this record does not invoke the potent weaponry of Chapter 93A.[24] Additionally, we deem waived the Chapter 93A

---

[24] Our analysis assumes, without deciding, that in certain instances settlement conduct during the course of ongoing

- 38 -

theories set forth in the 2006 complaint that the Museum failed to pursue in its 2011 pleadings.  Finally, any continued reliance on U.S. Fire's failure to pay defense costs prior to the December 2007 order also fails as a matter of law since the record fails to show that the insurance company's conduct, while amounting to a contractual breach, was purposed by the kind of nefarious leveraging that may give rise to Chapter 93A, § 11 liability.  Cf. N. Sec. Ins. Co., 941 N.E.2d at 692-93; Mass. Emp'rs Ins. Exch., 648 N.E.2d at 438.

Accordingly, we reverse the district court's decision that U.S. Fire violated Chapter 93A, § 11 and vacate the award of punitive damages, fees, costs and statutory interest associated with the Chapter 93A claim.  Our holding obviates any need to address the punitive damages issues debated by the parties pursuant to Rhodes v. AIG Domestic Claims, Inc., 961 N.E.2d 1067 (Mass. 2012) and Auto Flat Car Crushers, Inc. v. Hanover Ins. Co., 17 N.E.3d 1066 (Mass. 2014).

## V.

Two final miscellaneous matters go nowhere.  First, the Museum appeals the district court's decision declining to award it attorney's fees for litigating the scope of defense obligations

litigation may give rise to Chapter 93A liability.  Compare Morrison v. Toys "R" Us, Inc., 806 N.E.2d 388, 391 (Mass. 2004), with Commercial Union Ins. Co., 217 F.3d at 41 n.5.

after the 2007 summary judgment order. Its appellate arguments depend on the success of its Chapter 93A claim and, thus, are rendered moot by our reversal of the district court's decision. To the extent that the Museum attempts to pursue arguments unrelated to its Chapter 93A success below, we deem them waived for insufficient briefing. See Powell, 783 F.3d at 348-49.

Second, U.S. Fire appeals the district court's decision denying its motion to amend its 2006 third-party complaint against ACE. U.S. Fire's 2009 motion sought to transform the original single-count complaint into a five-count complaint enforcing an alleged express or implied contractual agreement for sharing defense costs between the two insurance companies. We detect no abuse of discretion in the district court's decision given that the 2006 third-party complaint had already failed on the merits months earlier.[25] Additionally, U.S. Fire's 2009 pitch of newly discovered facts is undermined both by its own express allegations in the original complaint and by its apparent failure to pursue timely discovery from the inception of that 2006 third-party complaint. See Lombardo v. Lombardo, 755 F.3d 1, 3-4 (1st Cir.

---

[25] In its March 2009 summary judgment order, the district court granted ACE's motion for summary judgment due to U.S. Fire's insufficient proof that the oil release was "sudden and accidental" under ACE's 1980-1983 policy. See Peabody Essex Museum, 623 F. Supp. 2d at 112.

2014); <u>Steir</u> v. <u>Girl Scouts of the USA</u>, 383 F.3d 7, 12 (1st Cir. 2004).

## VI.

To summarize, we **affirm** the district court's December 2007 ruling that U.S. Fire breached its duty to defend and its September 2010 and August 2011 allocation rulings that are challenged on appeal. We **reverse** the district court's August 2011 finding of Chapter 93A liability and **vacate** its associated award of punitive damages. We also **vacate** the award of attorney's fees, costs, and statutory interest and **remand** for appropriate recalculation consistent with this opinion. **Parties to bear their own appellate costs.**